**\*\*FOR PUBLICATION\*\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MARJORIE CHULSKY, ON BEHALF OF HERSELF AND THOSE SIMILARLY SITUATED, | : | **Civil No. 10-3058 (FLW)** |
| Plaintiffs, | : | **OPINION** |
| v. | : | |
| HUDSON LAW OFFICES, P.C., LAURI A. HUDSON a/k/a LAURI A. HUDSON, ESQ., and JOHN DOES 1 to 10, | : | |
| Defendants. | : | |

**WOLFSON, United States District Judge:**

Presently before the Court is Defendants Hudson Law Offices ("Hudson Law") and Lauri A. Hudson a/k/a Lauri A. Hudson, Esq. ("Hudson") (collectively, "Defendants") motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), this putative class action brought by Plaintiff Marjorie Chulsky ("Plaintiff" or "Chulsky").  Plaintiff's claims arise of out of Hudson Law's purchase of, and attempts to collect, a consumer debt. Defendants seek to dismiss all of the claims asserted in Plaintiff's Complaint, which claims are brought under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, et seq., the New Jersey Consumer Fraud Act ("NJCFA" or "the Act"), N.J.S.A. 56:8-1, et seq., and the New Jersey Truth in Consumer Contract, Warrant and Notice Act ("TCCWNA"),

1

N.J.S.A. 56:12-14, et seq.  In addition, Defendants contend that Defendant Lauri A. Hudson cannot be held individually liable for the challenged actions and should, therefore, be dismissed from the suit.  For the reasons that follow, the Court grants Defendants' motion with respect to the NJCFA and TCCWNA claims, but denies Defendants' motion with respect to Plaintiff's FDCPA claim.[1]

## I.      BACKGROUND

On March 26, 2010, Defendant Hudson Law filed a complaint ("Hudson Complaint") against Plaintiff in the Superior Court of New Jersey, Special Civil Part, Small Claims in Monmouth County, New Jersey, to collect on a $1,194.72 credit card debt. Compl. ¶ 24.  The Hudson Complaint states that Hudson Law "is a successor in interest to this credit card account first issued by First Bank of Delaware for a Continental Finance MasterCard ...."  Compl., Exh. A ("Hudson Compl.") at 1.  The Bill of Sale attached to the Hudson Complaint states that Hudson Law purchased the debt from Credit Solutions, Corp.  See Bill of Sale dated Mar. 30, 2008.  The Hudson Complaint was signed by Defendant Hudson as attorney for Hudson Law.  Plaintiff alleges that Hudson Law has purchased over 100 similar consumer debts and that Defendant Hudson files actions to

---

[1]      The Court initially filed an opinion, on February 10, 2011, ruling on Defendants' motion.  That opinion, *inter alia*, dismissed Plaintiff's NJCFA claim.  After the opinion was filed, the Court *sua sponte* directed the parties to file supplemental briefing on state law relating to Plaintiff's NJCFA claim that was not discussed in the parties' initial briefing.  The Court now issues an Amended Opinion on the NJCFA claim only; the remaining language in the February 10, 2011 opinion is unaltered.

collect on those debts.  Compl., ¶ 29.  According to Plaintiff, on May 11, 2010, the Hudson Complaint was dismissed via a Stipulation of Dismissal with Prejudice.[2]

Plaintiff filed the instant action on May 12, 2010, challenging Defendants' filing of the Hudson Complaint under the FDCPA, NJCFA, and TCCWNA, and Defendant removed to this Court on June 16, 2010.  In connection with each claim asserted, Plaintiff alleges that Hudson Law's purchase of the debt was an *ultra vires* corporate act because professional services corporations, such as law firms, are prohibited from engaging in the purchase of consumer debts.

In support of Plaintiff's legal conclusion that Hudson Law's purchase was an *ultra vires* act, Plaintiff cites to New Jersey's Professional Services Corporation Act ("PSCA"), N.J.S.A. 14A:17-1 et seq., which limits the business and investment activities of professional service corporations.  In her complaint, Plaintiff points specifically to the following language found in the PSCA:

> No professional corporation shall engage in any business other than the rendering of the professional services for which it was specifically incorporated; and no foreign professional legal corporation shall engage in any business in this State other than the rendering of legal services of the type provided by attorneys-at-law; provided, that nothing in this act or in any other provisions of existing law applicable to corporations shall be interpreted to prohibit such corporation from investing its

---

[2]     The Court notes that the copy of the Stipulation of Dismissal attached to Plaintiff's Complaint is unsigned.  However, the Court need not rely upon this fact in ruling on Defendants' motion.

> funds in real estate, mortgages, stocks, bonds or any other type
> of investments, or from owning real or personal property
> necessary for, or appropriate or desirable in, the fulfillment or
> rendering of its professional services.

N.J.S.A. 14A:17-9.  Defendant disputes Plaintiff's reliance on this statutory provision and

moves to dismiss each of Plaintiff's claims.

## II.      STANDARD OF REVIEW

In reviewing a motion to dismiss for failure to state a claim under 12(b)(6), a Court

must take all allegations in the complaint as true, viewed in the light most favorable to the

plaintiff "and determine whether, under any reasonable reading of the complaint, the

plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d

Cir. 2008) (citation and quotations omitted). In Bell Atlantic Corporation v. Twombly, 550

U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court "retired" the language

in Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint

should not be dismissed for failure to state a claim unless it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

Twombly, 550 U.S. at 561 (quoting Conley, 355 U.S. at 45-46). Rather, the factual allegations

in a complaint "must be enough to raise a right to relief above the speculative level." Id.

at 555. The Third Circuit summarized the pleading requirement post- Twombly:

> The Supreme Court's Twombly formulation of the pleading
> standard can be summed up thus: 'stating ... a claim requires
> a complaint with enough factual matter (taken as true) to

4

> suggest 'the required element.' This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of 'the necessary element.'

Phillips, 515 F.3d at 234 (quoting Twombly, 550 U.S. at 556).

In affirming that the Twombly standard applies to all motions to dismiss, the Supreme Court recently further clarified the 12(b)(6) standard. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, ---U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." Iqbal, 129 S.Ct. at 1950. Accordingly, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id. In short, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009).

## III.   DISCUSSION

Defendants raise several challenges to each of Plaintiff's causes of action.  I address each in turn.

### A.   The Purchase and Collection of Consumer Debts by a Professional Services Corporation

As an initial matter, the Court addresses Defendants' argument that Plaintiff fails

to state claim under the Professional Services Corporation Act.  It is clear from the face of Plaintiff's Complaint; however, that she is not asserting a direct claim under that Act. Instead, she merely references the PSCA in connection with her substantive claims under the FDCPA, NJCFA, and TCCWNA.  That said, in light of Plaintiff's reliance on the PSCA in connection with her substantive claims, the Court addresses whether Plaintiff's reliance is appropriate.

N.J.S.A. 14A:17-9 provides, in pertinent part:

> No professional corporation shall engage in any business other than the rendering of the professional services for which it was specifically incorporated; . . . provided, that nothing in this act or in any other provisions of existing law applicable to corporations shall be interpreted to prohibit such corporation from investing its funds in real estate, mortgages, stocks, bonds or any other type of investments ....

Id.  Plaintiff alleges that Hudson Law violates this statute "by engaging in a business outside of [the practice] it was organized to engage in or allowed by law to engage in." Compl., ¶ 48C. The statute, on its face, precludes a professional corporation from engaging in "any business other than the rendering of professional services," hence Plaintiff's allegation, which must be taken as true on a motion to dismiss, sufficiently alleges a violation of the statute.  Indeed, Defendants have not argued, in their papers, that Hudson Law did not engage in such a business.

This is not to say, however, that Hudson Law's mere purchase of Plaintiff's debt

violates N.J.S.A. 14A:17-9.  To the contrary, the plain language of the Act provides "that nothing in this act or in any other provisions of existing law applicable to corporations shall be interpreted to prohibit such corporation from investing its funds in real estate, mortgages, stocks, bonds or *any other type of investments*."  Id. (emphasis added).  The statute's use of "any of other types of investments" is broad enough to include the purchase of debt obligations, such as Plaintiff's credit card debt, for investment purposes. It is only Plaintiff's allegation that Hudson Law engaged in the *business* of purchasing and collecting debts that alleges a violation of the PSCA.

Based on this alleged violation, Plaintiff contends that Hudson Law's purchase of, and attempt to collect, Plaintiff's debt are *ultra vires* or illegal acts that render Hudson Law's purchase of the debt void.  Further, as stated in Plaintiff's opposition brief, Plaintiff alleges that "[b]ecause [Hudson Law] is barred from acting as a debt buyer and cannot legally perform the activities of a debt buyer, it was a misrepresentation for HLO to claim that Plaintiff owed a debt to [Hudson law]." Pl. Opp. at 8.  And, Plaintiff further suggests, "[b]ecause HLO was barred by law from the purchase, the contract between Credit Solutions. [sic] Corp. and HLO is likely *void ab initio* for reasons of illegality." Id. at 8, n.1.

As noted, while Hudson Law's purchase of the debt does not facially violate the PSCA, its alleged operation of a separate debt collection business under the auspices of its professional practice does.  In this sense, Plaintiff is correct that a professional corporation's

attempt to collect on a debt that is in violation of the statute would not likely be enforced by New Jersey courts.  Indeed, New Jersey courts will invalidate, as void against public policy,

> [a]n agreement [that] is . . . injurious to the interest of the public, contravenes some established interest of society, *violates some public statute*, is against good morals, tends to interfere with the public welfare or safety, or ... is at war with the interests of society and is in conflict with public morals.

Marcinczyk v. State of New Jersey Police Training, 203 N.J. 586, 594 (2010) (quoting Frank Briscoe Co. v. Travelers Indem. Co., 65 F.Supp.2d 285, 312 (D.N.J. 1999)).  Simply put, "contractual provisions that tend to injure the public in some way will not be enforced." Id. (quoting Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 403-04 (1960)) (citation omitted).  While not all violations of a statute are *ipso facto* void for public policy, see Williston at § 12:4; Exit A Plus Realty v. Zuniga, 395 N.J.Super. 655, 664 (App. Div. 2007) (refusing to invalidate a contract, reasoning "if the Legislature had wanted to invalidate agreements entered in contravention of N.J.S.A. 45:15-17, it could have done so explicitly ...."), "[l]egislation intended to secure general objectives of public policy or morals cannot be circumvented by private agreements."  General Motors Acceptance Corp. v. Cahill, 375 N.J.Super. 553, 566 (App. Div. 2005).  Thus, where the public policy violated by the contract "is to secure general objects of policy or morals," as opposed to a statutory provision designed for the benefit of individuals, courts are more likely to hold the offending contract

void.  Id.

For example, in Sedaghat v. Jabbary, Docket No. L-7303-01, 2005 WL 3242263 (N.J. App. Div. Dec. 2, 2005), the New Jersey Appellate Division held a professional corporation contract void as against public policy.  In that case, the plaintiff, a Florida businessman, filed suit against two New Jersey-licensed dentists that had borrowed money from him to purchase their dental practice.  In connection with that loan, the defendant-dentists created a trust designating the dental practice as the trustee holding the assets of the practice, and listed themselves and the plaintiff as beneficiaries.  The trust, further, provided that after five (5) years, or upon written demand of all beneficiaries, the assets and accrued income of the trust estate was to be paid over to the beneficiaries.  The Appellate Division held that the trust violated N.J.S.A. 14A:17-10(a), a provision of the PSCA that prohibits professional corporations from issuing shares to non-licensed persons, as well as N.J.A.C. 13:30-8.13, a regulation that prohibits dentists from sharing fees with non-dentists.  Id. at *4.  Citing the maxim that "[a]n agreement or contract that is contrary to public policy is void and unenforceable as a matter of law," the court ruled thereafter that "the trial court properly granted summary judgment dismissing all of plaintiff's claims arising out of the declaration of trust."  Id.

I find Sedaghat persuasive in that it is consistent with New Jersey cases addressing

contracts that violate public policy discussed *supra*.[3]  Applying Sedaghat's reasoning here,

I further conclude that Plaintiff has sufficiently alleged that Hudson Law's operation of a

debt collection business would render its collection of Plaintiff's debt unenforceable under

New Jersey law.  Accord Dalton, 412 F.Supp. at 1007 (holding that, where contract was

unenforceable, all claims arising out of or "directly connected with the illegal contract . .

. are equally tainted").

That New Jersey public policy would be affronted by Hudson Law's alleged

operation of a debt collection business under the auspices of its professional offices is

supported by the New Jersey Supreme Court's ruling that "[c]ontracts that violate the

[New Jersey's Rules of Professional Conduct ("RPCs")] violate public policy, and courts

must deem them unenforceable."  Jacob v. Norris, McLaughlin & Marcus, 128 N.J. 10, 17

(1992).  And, though the Plaintiff does not allege violation of a specific RPC, Advisory

Committee on Professional Ethics Opinions express New Jersey's public policy that

"lawyers must keep their practices entirely separate from their business enterprises ...."

Advisory Comm. on Prof. Ethics, Op. No. 688, 159 N.J.L.J. 1050 (Mar. 13, 2000).

In short,  the Court must accept as true, on this motion to dismiss, Plaintiff's

allegation that Defendants operated a debt collection business under the auspices of

---

[3]     While this unpublished decision is non-binding, see R. 1:36-3, the Court may
rely upon its reasoning as persuasive authority.  Falcon v. American Cyanamid, 221 N.J.
Super. 252 (App. Div. 1987); James Const. Co., Inc. v. Director, Div. of Taxation, 18 N.J.Tax
224, 229 n.1 (1999).

Hudson Law, and in such a manner as to violate the PSCA.[4]  Having concluded that New

Jersey courts would not enforce an attempt to collect on a contract violative of the PSCA,

the Court will now turn to Plaintiff's substantive claims and Defendants challenges thereto.

### B.    FDCPA

The FDCPA was enacted to "eliminate abusive debt collection practices by debt

collectors, to insure that those debt collectors who refrain from using abusive debt

collection practices are not competitively disadvantaged, and to promote consistent State

action to protect consumers against debt collection abuses." 15 U.SC. § 1692(e).  Specifically,

the FDCPA prohibits the use of any conduct the natural consequences of which is to harass,

oppress, or abuse any person, 15 U.S.C. § 1692d, any false, deceptive, or misleading

representations or means, 15 U.S .C. § 1692e, and any unfair or unconscionable means, 15

U.S.C. § 1692f, to collect or attempt to collect any debt.  The FDCPA creates a private cause

of action against debt collectors who violate its provisions. Brown v. Card Service Center,

464 F.3d 450, 453 (3d Cir. 2006) (15 U.S.C. § 1692k).[5]

---

[4]    Only discovery will reveal whether Hudson Law actually operated a debt collection business in such a fashion as to be barred by the PSCA.

[5]    Defendants do not challenge Plaintiff's allegation that Hudson Law is a debt collector within the meaning of the FDCPA.  Indeed, the Bill of Sale attached to the Hudson Complaint seems to indicate that Hudson Law purchased the debt after Plaintiff defaulted on the debt, which would make Hudson Law a debt collector under the FDCPA.  See Pollice v. National Tax Funding, L.P., 225 F.3d 379, 404 (3d Cir. 2000) ("[O]ne who acquires the debt after it is in default is deemed a debt collector, and is subject to the provisions of the Act.") (quoting Duff McKee, Liability of Debt Collector to Debtor under the Federal Fair

In determining whether a communication from a debt collector violates the FDCPA, a court must analyze the debt collector's statements from the perspective of the "least sophisticated debtor," id. at 454; Campuzano-Burgos v. Midland Credit Mgmt., 550 F.3d 294, 301 (3d Cir. 2008), in order to protect "all consumers, the gullible as well as the shrewd." Rosenau v. Unifund Corp., 539 F.3d 218, 221 (3d Cir. 2008) (quoting Brown, 464 F.3d at 454). Although the "least sophisticated consumer" standard is a low standard, it nonetheless "'prevents liability for bizarre or idiosyncratic interpretations of collection notices by preserving a quotient of reasonableness and presuming a basic level of understanding and willingness to read with care.'" Rosenau, 539 F.3d at 221 (quoting Wilson v. Quadramed Corp., 225 F.3d 350, 355 (3d Cir. 2000)).

As an initial matter, I address Defendants' argument that the 15 U.S.C. § 1692e(11) exemption for formal pleadings bars Plaintiff's FDCPA claim. That provision reads, in pertinent part:

> [T]he following conduct is a violation of [§ 1692e] . . . [t]he
> failure to disclose in the initial written communication with the

_____

Debt Collection Practices Act, 41 Am.Jur. Proof of Facts 3d 159, at § 3 (1997)); see also 15 U.S.C. § 1692a(4), § 1692a(6) (defining "creditor" and "debt collector," respectively). Moreover, "[a]ttorneys who regularly engage in debt collection or debt collection litigation are covered by the FDCPA, and their litigation activities must comply with the requirements of the FDCPA." F.T.C. v. Check Investors, Inc., 502 F.3d 159, 172 (3d Cir. 2007).

> consumer . . . that the debt collector is attempting to collect a
> debt and that any information obtained will be used for that
> purpose . . . *except that this paragraph shall not apply to a formal*
> *pleading made in connection with a legal action*.

15 U.S.C. § 1692e(11). By its own terms, the exemption for legal pleadings is limited to the

disclosure requirement that a debt collector state it is "attempting to collect a debt and that

any information obtained will be used for that purpose." See Sayyed v. Wolpoff &

Abramson, 485 F.3d 226, 231 (4th Cir. 2007); id. ("This provision expressly exempts formal

pleadings from a sole, particularized requirement of the FDCPA: the requirement that all

communications state that they come from a debt collector."); Sebrow v. Fein, Such, Kahn,

& Shephard, P.C., Civ. Action No. 10-215, 2010 WL 4553559, *2 n.3 (D.N.J. Nov. 1, 2010)

("[I]t is unlikely that a complaint alleging violations of Section 1692e(11) based solely on

a formal pleading in another action could survive a motion to dismiss pursuant to

Fed.R.Civ.P. 12(b)(6)."). Since Plaintiff has not alleged a violation of the § 1692e(11)

disclosure requirement, the exemption for formal pleadings is inapplicable here.

Moreover, Congress has enacted a similarly circumscribed provision in 2006,

exempting pleadings specifically from the FDCPA's initial communication notice

requirement. Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA, –- U.S. –-, 130 S.Ct.

1605, 1612 (2010) (citing 15 U.S.C. § 1692g).[6] That Congress enacted this separate provision

---

[6]      "The FDCPA has been amended some eight times since its enactment in 1977;
the most recent amendment addressed a concern not unrelated to the question we consider
today, specifying that a pleading in a civil action is not an 'initial communication'

13

of the same nature as the § 1692e(11) exemption buttresses my conclusion that the latter does not apply generally to all FDCPA claims, but is limited to the particular paragraph in which the exemption is found. Accordingly, I reject Defendants' argument that the § 1692e(11) exemptions bars Plaintiff's FDCPA claim.[7]

Turning to Plaintiff's substantive allegations, each of the alleged FDCPA violations is predicated upon the notion that Hudson Law's purchase of Plaintiff's debt was invalid, that Hudson Law cannot act as a debt collector, and, thus, Hudson Law is not the true owner of the debt under New Jersey law. Plaintiff, generally, alleges a violation of § 1692e, which prohibits the use of "any false, deceptive, or misleading representations or means in connection with the collection of any debt." 15 U.S.C. § 1692e. In addition, Plaintiff alleges that Defendants' actions violate two specific subsections of § 1692, namely, subsections § 1692e(2)(A) and § 1692e(10). The former bars debt collectors from misrepresenting the "legal status of any debt." The latter bars the "use of any false representation or deceptive means to collect or attempt to collect a debt ...." "Courts have

triggering obligations under § 1692g requiring a written notice to the consumer. Financial Services Regulatory Relief Act of 2006, § 802(a), 120 Stat. 2006 (codified at 15 U.S.C. § 1692g(d))." Id. at 1610, n.22.

[7]     Moreover, as the Third Circuit has recently made clear, New Jersey's common law litigation privilege for communications made in judicial proceedings does not apply to FDCPA claims. Allen ex rel. Martin v. LaSalle Bank, N.A., — F.3d —, 2011 WL 94420, * 4 (3d Cir. 2011).

long held that after finding a valid claim under a more specific subsection of § 1692e . . . further analysis under § 1692e(10) is 'somewhat duplicative." Gervais, 479 F.Supp.2d at 276 -77 .  Hence, this Court's § 1692e analysis will focus primarily on § 1692e(2)(A).  Finally, Plaintiff alleges that Defendants' actions violate § 1692f(1), in that Hudson Law attempted to collect a debt that "was not expressly authorized by the agreement creating the debt or permitted by law."  Compl., ¶ 68.

Plaintiff's claim premised on § 1692f(1) is not viable.  The plain language of § 1692f(1) bars collection of "any *amount* . . . unless such *amount* is expressly authorized by the agreement creating the debt or permitted by law."  15 U.S.C. § 1692f(1) (emphasis added).  In other words, "[i]f the agreement does not expressly authorize or state law does not permit the amounts sought, [Plaintiff] has stated a viable claim under § 1692f(1)."  Allen ex rel. Martin v. LaSalle Bank, N.A., — F.3d —, 2011 WL 94420, *4 (3d Cir. 2011).  Here, Plaintiff's allegations do not challenge the amount sought in the Hudson Complaint; rather, her allegations focus on Hudson Law's inability to legally purchase the debt under the PSCA.  Because her allegations do not speak to the amount sought, they do not state a claim under § 1692f(1).  Compare Barows v. Chase Manhattan Mortg. Corp., 465 F.Supp.2d 347, 358 (D.N.J. 2006) ("construing the allegations in Plaintiff's Complaint as true, Plaintiff has stated a claim that the Hubschman Defendants attempted to collect *attorneys' fees and costs* not permitted by law in violation of the FDCPA.") (emphasis mine).

A fair reading of Plaintiff's Complaint reveals that her allegations under § 1692e, § 1692e(2)(A), and § 1692e(10) are that: (1) Hudson Law's representation of itself as legal owner of the debt is deceptive; and (2) Hudson Law misrepresented the legal status of her debt by attempting to a collect on a debt that is unenforceable under New Jersey law. As an initial matter, the Court rejects Plaintiff's argument that Hudson Law's representation of itself as legal owner of the debt is deceptive. As noted *supra*, the PSCA does not preclude professional corporations from investing in consumer debts; it only precludes the joint operation of a debt collection business. Thus, the ensuing analysis focuses solely on Hudson Law's alleged misrepresentation of the legal status of Plaintiff's debt by allegedly attempting to a collect on a debt that violates and is unenforceable under New Jersey law.

Several courts have considered whether a violation of state law may form the basis of a §1692e claim. The most factually analogous case in this circuit is <u>Crossley v. Lieberman</u>, a 1989 Third Circuit decision holding that an attorney's inclusion, in a letter, of a statement contravening Pennsylvania state law violated § 1697 e(10). 868 F.2d 566, 571 (3d Cir. 1989). The attorney in that case mailed a letter to a mortgagor in default on her mortgage, which letter threatened that the mortgagee would file a foreclosure action against her "within one week," despite a Pennsylvania foreclosure law that prohibited the filing of a foreclosure action until thirty (30) days after providing a written notice of intent to foreclose. The Third Circuit held that the attorney's letter was misleading because it

16

misrepresented the lender's ability to proceed against the mortgagor under state law within one week when, under Pennsylvania law, a proceeding could not be instituted for thirty (30) days.[8] Suggesting that <u>Crossley</u> is still good law, the Third Circuit recently cited it for the proposition that "attorney debt collectors warrant closer scrutiny because their abusive collection practices 'are more egregious than those of lay collectors." <u>Campuzano-Burgos</u>, 550 F.3d at 301. <u>Crossley</u> differs from the allegations here only in that the communication involved in that case was a letter whereas the communication here was included in a pleading document.

Other, more recent, district court cases have assessed whether a state law violation may form the basis of a claim under § 1692e based on statements made in a state court pleading. In <u>Scioli v. Goldman & Warshaw P.C.</u>, 651 F.Supp.2d 273 (D.N.J. 2009), for example, the court addressed whether the inclusion in a state court complaint of a certain amount of attorneys' fees violated §1692e(2)(B). After concluding that the attorney's fees sought were actually permitted by the state statute, the Court rejected the Plaintiff's claim. <u>Id.</u> at 281. Similarly, in <u>Miller v. Javitch, Block & Rathbone</u>, 534 F.Supp.2d 772 (S.D.Ohio 2008), a district court rejected a § 1692e claim based on the alleged misrepresentation of the defendants' legal status as a holder in due course where it concluded the "Defendants have

---

[8]     Pennsylvania law also required foreclosing lenders to inform the debtor of her right to cure. <u>Id.</u> at 571. The court found the attorney's failure to inclusion such notice in his letter to constitute another misrepresentation. <u>Id.</u>

presented ample evidence that it did, in fact, purchase all right, title and interest to [the plaintiff's] debt.".  Id. at 776.

At least one circuit court, however, has questioned whether the FDCPA governs the content of state court complaints, as opposed to other non-pleading documents.  In Beler v. Blatt, Hasenmiller, Leibsker & Moore,LLC, 480 F.3d 470 (7th Cir. 2007), the Seventh Circuit challenged the idea that the FDCPA "regulates the contents of complaints, affidavits, and other papers filed in state court."  Id. at 472.  In that court's view, "state's rules of procedure, not federal law, determine which facts, and how much detail, must be included in documents filed with a clerk of court for presentation to a judge."  Id. at 473.  But that case is distinguishable from the facts here because the plaintiff in that case did not allege that the contents of the pleading were deceptive; that plaintiff alleged only that the complaint was not written in plain english.  Id. (noting that plaintiff argued that description in affidavit of contracts creating debt was "not clear enough to enable an unsophisticated consumer").  See also Miller v. Javitch, Block & Rathbone, 561 F.3d 588, 594-96 (6th Cir. 2009) (holding that language in state court complaint that claim was "for money loaned," and use of "charge card" language, was not misleading even though language may have been difficult to interpret for the least sophistical consumer).

Here, unlike the plaintiff in Beler, Plaintiff has asserted that Hudson Law's filing of the Hudson Complaint misrepresented its ability to collect Plaintiff's debt under New

Jersey law.  As indicated *supra*, I agree that Plaintiff has sufficiently alleged that Hudson Law's operation of the debt collection business would render its attempt to collect the debt unenforceable.  Further, that the debt was owned and prosecuted by a law firm could have created in a least sophisticated consumer's mind an impression of legal validity not typically imputed to a creditor's actions.  Cf. Campuzano-Burgos, 550 F.3d at 301 ("Debtors react more quickly to an attorney's communication because they believe 'that a real lawyer, acting like a lawyer usually acts, directly controlled or supervised the process through which [such a] letter was sent.") (quoting Avila v. Rubin, 84 F.3d 222, 229 (7th Cir. 1996)).  Thus, based on the Third Circuit's holding in Crossley and the more recent district court cases that have acknowledged a §1692e violation may be based on a misrepresentation of the ability to collect a debt under state law, I conclude that Plaintiff has sufficiently plead an § 1692e claim.

### C.    NJCFA

Turning now to Plaintiff's claim under the New Jersey Consumer Fraud Act, this Court must comment that the analysis of this claim requires careful scrutiny of the case law and, in that regard, notes the confusion that is engendered by the parties' selective quoting from the relevant cases, and the cases' lack of clarity in espousing general principles of applicability under the Act.  Accordingly, a somewhat lengthy discussion of the relevant cases follows.

Plaintiff's NJCFA claim relates to Hudson Law's purchase and attempt to collect on Plaintiff's defaulted credit card debt initially owed to the First National Bank of Delaware, sold to Credit Solutions, Inc., and then re- sold (or assigned) to Hudson Law.[9]  To be sure, Plaintiff does not dispute the validity of her underlying debt to First National Bank of Delaware.  That initial issuer of credit is clearly subject to the NJCFA.  See Lemelledo v. Beneficial Management Corp. of America, 150 N.J. 255 (1997).  Plaintiff's claim against Hudson Law raises the issue of whether a debt buyer—"a purchaser or assignee of defaulted debt"— is subject to the NJCFA for its alleged misrepresentations in connection with its debt collection practices.  Kuhne v. Cohen & Slamowitz, LLP, 579 F.3d 189, 194 (2d Cir. 2006) (defining "debt buyer").  Defendants argue that a debt buyer is not subject to the NJCFA because it does not engage in the "sale" of "merchandise" as those terms are defined by the NJCFA.[10]

---

[9]    Plaintiff alleges that Hudson Law "engaged in the business of purchasing charged-off and/or delinquent credit card accounts and other consumer debts."  Compl. at ¶ 15.

[10]    At the outset, the Court rejects Defendants' reliance on the tax sale certificate decisions in Varsolona v. Breen Capital Services Corp., 180 N.J. 605 (2004) and Jackson v. HSBC Bank USA, 393 N.J.Super. 1 (App. Div. 2007).  Defendants rely on those decisions for the proposition that "instituting a lawsuit to recover on a third party debt creates no cognizable nexus with the protections afforded a consumer to avoid false and deceptive advertisement of merchandise in connection of a sale."  Def. Ltr. Br. dated March 1, 2011 at 2.  Contrary to Defendants' assertion, those cases did not foreclose the possibility of a NJCFA claim against a servicer of an installment sale loan for past-due tax debt.  Varsolona, 180 N.J. at 630; Jackson, 393 N.J.Super. at 753-54.  Rather, those cases held that the servicers in those cases did not engage in any unconscionable practices in connection with their

In ruling on this issue, I may not interpret the NJCFA simply according to my reading of the statute.  Rather, as a federal court sitting in diversity, I must apply New Jersey's substantive law as that law has been set forth by its legislature or Supreme Court. Jaworowski v. Ciasulli, 490 F.3d 331, 333 (3d Cir. 2007) (citing Packard v. Provident Nat'l Bank, 994 F.2d 1039, 1046 (3d Cir. 1993)).  "When a state's highest court has yet to speak on a particular issue, it becomes the role of the federal court to predict how the state's highest court would decide the issue were it confronted with the problem." Id. (quoting Packard, 994 F.2d at 1046) (internal citation marks and alterations omitted).  In predicting how the New Jersey Supreme Court would rule, I am to "give careful consideration to decisions of the [New Jersey's] intermediate appellate courts and . . . aim to eliminate inconsistency between the federal and state courts in the application of [New Jersey] law." Id. (internal citations omitted).

The New Jersey Supreme Court recently reiterated its canons of statutory interpretation.  According to the Court, the primary goal of "divin[ing] and effectuat[ing] the Legislature's intent,"  begins with "the language of the statute, giving the terms used therein their ordinary and accepted meaning." State v. Shelley, --- N.J. ----, 2011 WL 799765 at *2 (2011).  When the statutory language is clear and unambiguous, there is no need to

---

collection activities.  See Jackson, 393 N.J.Super. at 753-54 (stating the trial court "properly reject[ed the] contention that [installment payment plans] could never give rise to a CFA claim under Varsolona").

consider extrinsic aids.  Where, however, the language is ambiguous, the Supreme Court consults legislative history and other extrinsic evidence for interpretive guidance.  Id. Furthermore, the Supreme Court considers "not only the particular statute in question, but also the entire legislative scheme of which it is a part."  Kimmelman v. Henkels & McCoy, Inc., 108 N.J. 123, 129 (1987).  With these principles in mind, I turn to the issue at hand.

### 1.      The Debt Buying Industry and Regulation Thereof

"Credit card debt has increased dramatically over the past several years and Americans had more than $838 billion in outstanding credit card debt in 2007, according to industry estimates."   United States Government Accountability Office, Credit Cards: Fair Debt Collection Practices Act Could Better Reflect the Evolving Debt Collection Marketplace and Use of Technology, www.gao.gov/new.items/d09748.pdf at 1 (September 2009) ("GAO Report").  Of that outstanding debt, "[a]pproximately 6.6 percent of credit cards were 30 or more days past due in the first quarter of 2009—the highest delinquency rate in 18 years."  Id.  A loan is considered "delinquent" when it is past due 30 days or more.  Id. at 5.  In addition, once a consumer falls more than 180 days behind on paying a credit card debt, banks "charge off" the account.[11]

---

[11]      The Uniform Retail Credit Classification and Account Management Policy, 65 Fed. Reg. 36903 (June 12, 2000) sets forth bank regulatory accounting requirements, which requirements mandate that credit card accounts be "charged off after 180 days of delinquency for an open-end (revolving) account or 120 days for a closed-end (installment) account."  Id. at 5, n.1.

Credit cards issuers seek to recover the delinquent debt through a combination of methods, including by using their own in-house collection personnel, third-party collection agencies, debt-collecting attorneys, or by selling the defaulted debt to a debt buyer.  Id. Debt that is defaulted, but not yet charged off, is considered "performing," while charged-off debt is considered "non-performing."  Both types of defaulted debt are sold to debt buyers who, unlike other types of debt collectors, typically "purchase delinquent debt for a fraction of its face value." Id. at 6.[12]  Up to one-half of all purchased debt is resold several times over, which can make it difficult for consumers to verify the origin of the debt. Federal Trade Commission, Repairing A Broken System: Protecting Consumers in Debt Collection Litigation and Arbitration (July 2010) at B5, n.10, http://www.ftc.gov/os/2010/ 07/debtcollectionreport.pdf ("FTC Study").

In recent years, debt buying has grown significantly and now includes several business models.[13]  Some debt buyers are firms that focus solely on purchasing defaulted debt.  Id.  Others are collection agencies or collection law firms that purchase and collect on defaulted debt while, simultaneously, collecting on debt owned by others.  Yet others

---

[12]    Debt buyers purchase not only credit cards but "other forms of debt, including utility, health care, telecommunication, and automobile loans, as well as delinquent taxes." Id.

[13]    Despite the various types of debt buying businesses, the industry is highly concentrated into ten firms who make up 81 percent of the debt buying market.  Large purchasers of defaulted credit card debt include Portfolio Recovery Associates, Inc., Asset Acceptance Capital Corp., Asta Funding, and Encore Capital Group.  GAO Report at 7-8.

are "passive debt buyers," which are investors that buy and sell debt portfolios.  Id.

Passive debt buyers, unlike the other types of debt buyers, do not engage in debt collection.

Rather, they simply hold the debt for investment purposes.

The conduct of debt buyers who purchase defaulted debt is subject to the FDCPA

and state statutes similar to the FDCPA.[14]  See FTC v. Check Investors, 502 F. 3d 159, 171-72

(3rd Cir. 2007) (discussing FDCPA); Cal. Civ. Code §§ 1788-1788.33.  Some state and local

laws provide additional consumer protections such as heightened service of process

requirements for debt collection suits filed in state court.  See e.g., N.C. Gen. Stat. §§

58-70-115(5) and (6); N.Y. City Civ. Ct. Unif. Rules § 208.6 (2009).

New Jersey, however, does not have a debt collection statute fashioned after the

FDCPA.  Bills of that nature have been proposed, but none have been adopted.  A recent

bill, New Jersey Fair Debt Collection Practices Act, A652 (2010), makes a violation of its

terms also a NJCFA violation.  Assembly, No. 652 (Pre-filed for Introduction in the 2010

Session), http://www.njleg.state.nj.us/2010/Bills/A1000/652_I1.PDF (last visited March 21,

2011). A similar bill was proposed, but not enacted, in 2008.  That bill, S. 1988, also would

have made a violation of its terms or the FDCPA an unconscionable act under the NJCFA.

Interestingly, the S. 1988 bill expressly exempted from liability "any person commencing

---

[14]     In addition, section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a),
"broadly prohibits unfair or deceptive acts or practices, including those of creditors."  FTC
Study at B6, n.15.  See also Check Investors, 502 F.3d at 174 (noting that deceptive debt
collection practices are forbidden by the Act).

or engaged in litigation to collect a debt while acting within the scope of that litigation or effecting a judicial remedy ordered pursuant to that litigation." New Jersey Fair Debt Collection Practices Act (Introduced June 16, 2008), http://www.njleg.state.nj.us/2008/Bills/S2000/1988_I1.PDF (last visited March 21, 2011).

The only current New Jersey civil law directly referencing debt collectors is a bond statute, the Collection Agencies Act, N.J.S.A. 45:18-1, et seq., which is designed to protect creditors from agencies who misappropriate client funds; it is not a consumer protection statute. New Jersey, further, regulates the activities of collection agencies by way of criminal sanctions for unconscionable conduct in connection with debt collection activities, which sanctions are found in N.J.S.A. 2C:21-19. That provision prohibits, *inter alia*, usurious rates of interest and other unlawful collection practices such as "mak[ing] a false or inaccurate or incomplete statement of any . . . credit terms." N.J.S.A. 2C:21-19e.

It is important to address, in more detail than was necessary in connection with my FDCPA analysis, the rationale underlying the FDCPA's distinction between purchasers of defaulted debt, *i.e.*, debt buyers, and purchasers of non-defaulted debt. The goal of the FDCPA is to regulate third-party debt collectors who are primarily engaged in the *business of debt collection* as opposed to the initial lender or originator of the debt. Keeping with its goal of regulating those in the business of debt collection, the FDCPA distinguishes between assignees of a debt who service the loan and those who merely attempt to collect

upon the default thereof.

In Check Investors, the Third Circuit quotes from Schlosser v. Fairbanks Capital

Corp., 323 F.3d 534, 538 (7th Cir. 2003), a Seventh Circuit opinion that explains:

> [Under the FDCPA,] a creditor is broadly defined as one who "offers or extends credit creating a debt or to whom a debt is owed," 15 U.S.C. § 1692a(4), whereas a debt collector is one who attempts to collect debts "owed or due or asserted to be owed or due another." Id. § 1692a(6).
>
> For purposes of applying the Act to a particular debt, these two categories-debt collectors and creditors—are mutually exclusive. However, for debts that do not originate with the one attempting collection, but are acquired from another, the collection activity related to that debt could logically fall into either category. *If the one who acquired the debt continues to service it, it is acting much like the original creditor that created the debt. On the other hand, if it simply acquires the debt for collection, it is acting more like a debt collector.*

Id. at 536 (emphasis added).

Schlosser, further, explains the rationale underlying the FDCPA's focus on the status

of the debt at the time it is acquired by the assignee:

> Focusing on the status of the obligation asserted by the assignee is reasonable in light of the conduct regulated by the statute. For those who acquire debts originated by others, the distinction drawn by the statute—whether the loan was in default at the time of the assignment—makes sense as an indication of whether the activity directed at the consumer will be servicing or collection. *If the loan is current when it is acquired, the relationship between the assignee and the debtor is, for purposes of regulating communications and collections practices, effectively the same as that between originator and the debtor. If the loan is in*

> *default, no ongoing relationship is likely and the only activity will be*
> *collection.*

502 F.3d at 174 (quoting <u>Schlosser</u>, 323 F.3d at 538) (emphasis added).  In Congress' view,

third-party debt collectors of past due debts, unlike initial lenders of credit, are not

"restrained by the desire to protect their good will [with the consumer] when collecting

past due accounts, [but] are likely to have no future contact with the consumer and often

are unconcerned with the consumer's opinion of them."  <u>Id.</u> at 173 (internal quotation

marks and citations omitted).

### 2.    Debt Buyers under the NJCFA

Turning to the NJCFA, the plain language of the statute does not indicate whether

it applies to debt buyers.  The statute provides, in pertinent part,

> The act, use or employment by any person of any
> unconscionable commercial practice, deception, fraud, false
> pretense, false promise, misrepresentation, or the knowing,
> concealment, suppression, or omission of any material fact
> with intent that others rely upon such concealment,
> suppression or omission, *in connection with the sale or*
> *advertisement of any merchandise or real estate or with the*
> *subsequent performance of such person as aforesaid ....*

N.J.S.A. 56:8-2 (emphasis added).  The statute defines "merchandise" as "any objects,

wares, goods, commodities, services or anything offered, directly or indirectly to the public

for sale." N.J.S.A. 56:8-1(c).  And, it defines "sale" as "any sale, rental or distribution, offer

for sale, rental or distribution or attempt directly or indirectly to sell, rent or distribute."

N.J.S.A. 56:8-1(e).  Finally, the Act defines "advertisement" as "the attempt directly or indirectly by publication, dissemination, solicitation, indorsement or circulation or in any other way to induce directly or indirectly any person to enter or not enter into any obligation or acquire any title or interest in any merchandise or to increase the consumption thereof or to make any loan...."  N.J.S.A. 56:8-1(a).

Generally, the New Jersey Supreme Court has directed that the statute be interpreted broadly to effectuate its purpose of "eliminating sharp practices and dealings in the marketing of merchandise ...."  Lemelledo v. Benefit Mgmt. Corp., 150 N.J. 255, 263 (1997) (quoting Channel Cos. v. Britton, 167 N.J.Super. 417, 418 (App. Div. 1979)).  "To fully advance its remedial purposes, [the Court] construe[s] the Act liberally in favor of consumers."   Lee v. First Union Nat. Bank, 199 N.J. 251, 257 (2009) (internal quotation marks omitted).  Despite this liberality, the Court acknowledges that it "must abide by the [Act's] definitions that control the boundaries of the Act's reach."  Id.  The applicability of the NJCFA is to "hinge[ ] on the nature of a transaction, requiring a case by case analysis." Papergraphics Intern., Inc. v. Correa, 389 N.J.Super. 8, 13 (App. Div. 2006).

The New Jersey Supreme Court held in Lemelledo that the NJCFA applies to the "provision of credit."  150 N.J. at 265.  In that case, a NJCFA claim was brought against a commercial mortgage lender that engaged in loan packing, which is "a practice on the part of commercial lenders that involves increasing the principal amount of a loan by combining

28

the loan with loan-related services, such as credit insurance, that the borrower does not want." Id. at 259-60.  Read broadly, Lemelledo stands for the proposition that the NJCFA applies to the sale of credit.  Its specific holding, however, is that "the [NJCFA's] language is ample enough to encompass the sale of insurance policies as goods and services that are marketed to consumers."  Id. at 265.  The Court did not address whether the statute applies, in like manner, to assignees or debt buyers who purchase and attempt to collect upon defaulted debt.

Without a Supreme Court ruling on the issue, I must turn to any relevant Appellate Court decisions.  Plaintiff points to the decision in Jefferson Loan Co., Inc. v. Session, 397 N.J.Super. 520 (App. Div. 2008), which held that an assignee of a non-defaulted debt may be liable under the NJCFA for its collection activities.  In that case, a consumer-purchaser of a car entered into a Retail Installment Sales Contract ("RISC") with the car dealership. On the day of the purchase, Jefferson Loan Company ("Jefferson") advanced the funds for the purchase and assignment of the RISC to the dealership and sold the purchaser credit life and disability insurance.[15]  Id. at 527.  Jefferson collected two payments from the

---

[15]     The Eighth Circuit explains in Fielder v. Credit Acceptance Corp., 188 F.3d 1031 (8th Cir. 1999), how these financial arrangements are typically consummated:

> [The assignee] provides auto dealers a source of financing for used car purchasers with poor or limited credit histories. [The assignee] supplies dealers with retail installment contract forms containing numerous blanks to be filled in by the dealer and the purchaser before the contract is signed. The dealer then

purchaser before the purchaser defaulted on the loan.  Jefferson subsequently repossessed the car and returned it to the dealership, rather than selling the car and applying the proceeds to the purchaser's loan balance as required by the Uniform Commercial Code. Id.

The Jefferson Loan court hinged its analysis on the "subsequent performance" language in the statute, rejecting an argument that post-sale performance by an assignee was distinguishable from that of the original seller.  Id. at 178.  The court first noted that

> [t]he CFA was enacted by the Legislature in 1960, with the purpose of protecting the consumer against imposition and loss as a result of fraud and fraudulent practices by persons engaged in the sale of goods and services.  The Legislature amended N.J.S.A. 56:8-2 in 1967 to apply not just to the acts or omissions of an individual in the "sale or advertisement" of merchandise or real estate, but also "with the subsequent performance of such person aforesaid."

397 N.J.Super. at 534.  The court, thereafter, reasoned that the "subsequent performance of such person aforesaid"  language referred not only to the original seller but also to an assignee.  Id.

---

> assigns the completed contract to [the assignee], and [the assignee] administers and collects the loan from the purchaser.

Id. at 1033.  The court in Jefferson Loan made clear that Jefferson was not a "co-venturer" with the car dealership that assigned the RISC.  Nonetheless, it is likely that the Eighth Circuit's description appropriately describes Jefferson Loan's business because its name was listed on the original RISC documents as the lender.  Jefferson Loan, 397 N.J.Super. at 526.

In Jefferson Loan's view, a NJCFA "[P]laintiff need not prove that the defendant was directly involved in the original contract negotiations or sale," in order to state a claim under the statute.  Id.  The court considered this reasoning consistent with a prior Appellate Division decision upholding a NJCFA claim brought against an indirect supplier whose products were ultimately passed onto a buyer, id. at 178 (discussing Perth Amboy Iron Works, Inc. v. Am. Home Assur. Co., 226 N.J.Super. 200, 211 (App. Div. 1988), aff'd, 118 N.J. 249 (1990)), a case involving a claim against a landlord who had purchased a building from a prior owner and allowed the building to become inhabitable, id. (discussing 49 Prospect St. Tenants Ass'n v. Sheva Gardens, Inc., 227 N.J.Super. 449, 456 (App. Div. 1988)), and, lastly, a Truth in Lending Act suit that suggested in *dicta* that a NJCFA claim could be brought against an assignee of a RISC for its own, independent acts of fraud, id. (discussing Psensky v. Am. Honda Fin. Corp., 378 N.J.Super. 221, 231-2 (App. Div. 2005)).[16]  No policy reasons were given in support of the Jefferson Loan court's reasoning.

While Jefferson Loan expressed its holding in broad language, id. at 181 ("we conclude that an assignee of a RISC may be liable under the CFA for its own unconscionable commercial practices and activities related to its repossession and collection

---

[16]      Plaintiff is correct that Psensky states, in *dicta*, that an assignee may be held liable for its own NJCFA violations.  378 N.J.Super. at 231-32.  It goes without saying, however, that statements made in *dicta* do not constitute binding authority.

practices in connection with the subsequent performance of a RISC ....”), because the assignee in Jefferson Loan purchased the loan before it defaulted, the precise issue of whether the purchaser of a defaulted loan, *i.e.*, a debt buyer, falls under the NJCFA was not before that court.  In addition, as with Lemelledo, Jefferson Loan involved the sale of credit insurance along with the loan, although the Appellate Court did not focus its analysis on this fact.  Nonetheless, some courts have relied on Jefferson Loan to hold assignees liable under the NJCFA in disparate contexts, see, e.g., Gonzalez v. Wilshire Credit Corp., 411 N.J.Super. 582, 593 (App. Div. 2010) (relying on Jefferson Loan in applying the NJCFA to “agreements to cure default between a mortgagor who was not a party to that loan and the assignee and servicer of that loan”), or have stated its holding in broader terms, see e.g., Carmen v. Metrocities Mortg. Corp., Civil Action No. 08-2729, 2009 WL 1416038, *6 (D.N.J. May 18, 2009) (stating in a suit brought against a mortgage assignee who purchased the loan prior to default that “[a]ssignees may be held liable under the NJCFA for their own subsequent performance of the contract ....”); In re NorVergence, Inc., 424 B.R. 663 (Bankr.D.N.J 2010) (holding that an assignee-finance company that took immediate assignment of an equipment rental agreement from a re-seller of telecommunications equipment could be held liable under the NJCFA for its allegedly unconscionable subsequent performance).  But these cases, like Jefferson Loan, do not involve debt buyers.

The same is true for another case cited, in passing, by the Jefferson Loan court—

Associates Home Equity Services, Inc. v. Troup, 343 N.J.Super. 254 (App. Div. 2001). That case involved a foreclosure action brought by an assignee and servicer of a mortgage loan. The assignee in that case purchased the loan prior to default. See id. at 254 (noting two-year time difference from date of assignment and institution of foreclosure action). Indeed, there were allegations that "[the assignee] gave the [initial lender] a 'pre-approval determination' on February 23, 1996, two months before the [consumers] executed their loan application with [the initial lender] and [the initial lender] assigned the loan . . . nine days after the loan was closed." Id. at 269. The court interpreted this fact, along with other allegations, to support the plaintiffs' claim that the assignee participated in the fraud of the initial lender in connection with the initial mortgage sale. Id. at 270.

A year following Jefferson Loan, the question of the NJCFA's applicability to a purchaser of defaulted debt came before the Appellate Division in Hoffman v. Encore Capital Group, Inc., No. A-3008-07T1, 2008 WL 5245306, at *3 (N.J.Super.Ct.App.Div. Dec. 18, 2008). In that case, the Appellate Division issued a non-precedential decision holding that the NJCFA does not apply to purchasers of defaulted debt. The plaintiff-consumer, Hoffman, was sued in small claims court by Defendant Encore Capital Group, Inc. ("Encore"), a debt buyer.[17]    Encore's small claims complaint was dismissed against

---

[17]    While the Hoffman Court does use the term "debt buyer," it refers to Defendant as a "third-party debt collector" who purchases "delinquent debt" for "2.6% of face value." Id. at * 2, n. 2. The trial court opinion states that plaintiff alleged that the defendant "purchased the debt from a previous party that was also not the original

Hoffman because that court concluded that Hoffman was the victim of identity theft.

Before the small claims complaint was dismissed, Hoffman counterclaimed under the NJCFA and that counterclaim was transferred to the Law Division.  The Law Division judge dismissed Hoffman's NJCFA claim, reasoning that there was no "sale" between Encore and Hoffman because Encore purchased the defaulted debt purely for collection purposes and had never engaged in the sale of merchandise to Hoffman.  MRC Receivables v. Hoffman, Docket No. UNN-L-1798-07, Slip. Op. at 4 (N.J.Super.Ct.Law.Div. Jan. 9, 2008) ("[Encore] did not offer or sale anything to any consumers . . . [it] purchased existing debt from the original lender.").

On appeal, the Appellate Division affirmed for substantially the same reasons, adding further discussion on the applicability of the NJCFA.  Noting that Hoffman did not allege a NJCFA claim violation by the original lender, the court rejected the plaintiff's argument that Encore "stand[s] in the shoes of the commercial lenders from whom it purchased delinquent debt."  Id. at *2.  The court distinguishes Lemelledo as involving the sale of loan packing and, further, distinguished rent-to-own transactions from "the sale of

_____

creditor."  MRC Receivables v. Hoffman, Docket No. UNN-L-1798-07, Slip. Op. at 4 (N.J.Super.Ct.Law.Div. Jan. 9, 2008).

Further, for ease of reference, I refer to the consumer as Hoffman, although there was another consumer-defendant in the small claims suit who did not file an NJCFA counterclaim.  I also refer to the Defendant as Encore, although the Hoffman Court uses a different acronym that collectively represents Encore and other defendants.

34

delinquent debt from a commercial lender to a third-party debt collector, such as [Encore]."

Hoffman, 2008 WL 5245306 at *2.  In its view, the legislature intended for the NJCFA to

apply only to those consumer transactions made generally available to the public; the

NJCFA "does not cover every sale in the marketplace."  Id. at *3 (quoting Papergraphics,

supra at 13).  The court summarized its holding as:

> In this case, after purchasing existing debts at a discount from
> commercial lenders, [Encore] initiated collection activities.
> Consequently, [the] Judge . . . correctly concluded that
> plaintiffs' complaint failed to state a cause of action under the
> CFA because: (1) [Encore] did not induce any person to incur
> an obligation as defined by the CFA; and (2) [Encore] did not
> offer to sell "anything to any consumers."

Id.  Hoffman appealed the Appellate Division's ruling, but certification was denied.

Hoffman v. Encore Capital Group, Inc., 966 A.2d 1080 (2009).

Noticeably absent from Hoffman's analysis is any reference to Jefferson Loan.  On

the one hand, Hoffman's omission of Jefferson Loan is disconcerting.  As noted, Jefferson

Loan focuses on the "subsequent performance of such person aforesaid" language in the

NJCFA, holding that the statute encompasses the collection activities of an assignee.  Read

broadly, Jefferson Loan appears to encompass a debt buyer who attempts to collect on a

debt that originated as a consumer transaction. On the other hand, the Hoffman Court may

have viewed Jefferson Loan as it did Lemelledo—distinguishable on the basis of the sale

of insurance alongside the provision of credit.  Even assuming this latter interpretation of

Hoffman's rationale is correct, however, Hoffman does not offer any reason why purchasers of defaulted debt who engage in collection activities should be treated differently than purchasers of non-defaulted debt, like Jefferson, who engage in such activities. The Hoffman analysis is likely not fully developed in this manner because the opinion was not published as having precedential authority.

Since Hoffman, a District of New Jersey decision refused to apply the NJCFA to a debt collector.  In Boyko v. American Intern. Group, Inc., Civil No. 08-2214, 2009 WL 5194431 (D.N.J. Dec. 23, 2009), a district court relied, in part, on Hoffman's rationale to conclude that a third-party debt collector's activities did not fall within the ambit of the NJCFA.  Boyko held that "mere debt collection efforts *on behalf of a third party* who might have sold merchandise is not itself a sale of merchandise."  2009 WL 5194431 at *4 (emphasis added).  More to the point, the Boyko Court further reasoned that the "subsequent performance of such person aforesaid" language is "seemingly limited" to the original seller.  Id.  Thus, in its view, collection efforts on behalf of another party do not fall within the scope of the NJCFA's subsequent performance language.

Several points must be made about the Boyko decision.  First, while Boyko rejects the subsequent performance argument, it does not cite to or discuss Jefferson Loan. Instead, it relies on the Third Circuit's decision in Weiss v. First Unum Life Ins. Co., 482 F.3d 254 (3d Cir. 2007).  In that case, which involved an NJCFA claim premised on an

insurer's denial of benefits to an insured, the Third Circuit explained the NJCFA's

subsequent performance language as follows:

> The CFA covers fraud both in the initial sale (where the seller never intends to pay), and fraud in the subsequent performance (where the seller at some point elects not to fulfill its obligations) . . . The former scenario involves "a true con artist [who] ... does not intend to perform his undertaking, the contract or whatever; he means to pocket the entire contract price without rendering any service in return." The latter "involv[es] no deceit in the initial contract procurement, but fraud in its performance, as a party trying to protect its profit margin stops complying with certain contract specifications while at the same time falsely representing strict compliance."

Id. at 266, 266 n.8.  Weiss, however, preceded Jefferson Loan and hence does not address

Jefferson Loan's holding that the statute's subsequent performance language applies to

assignees.

Second, Boyko address the applicability of the NJCFA to a third-party debt collector

who collects on behalf of another—not a debt buyer, like the defendant in Hoffman, who

collects on its own behalf.  This distinction is significant because a debt collector that

collects for another is not an assignee of the original lender but is more akin to an agent.

Thus, Boyko's analysis does not aid me in determining whether the NJCFA applies to the

activities of a debt buyer.

Most recently, the district court in Nicholls v. Portfolio Recovery Associates, LLC,

Civil Action No. 09-5714, 2010 WL 1257738 (D.N.J. Mar. 29, 2010), directly addressed

whether the NJCFA applied to a debt buyer.  In that case, a debt buyer sent a collection

letter to the consumer-debtor.  The defendant in that case, Portfolio Recovery Associates,

LLC ("Portfolio"), was a debt buyer who purchased the consumer's account from a

commercial credit card lender. Id. at *1.[18] Rejecting the consumer's argument that Portfolio

was subject to the NJCFA for its collection practices, the Nicholls Court reasoned that

> [t]he NJCFA requires fraud in connection with the sale or
> advertisement of any merchandise [and] there is no allegation
> of activity in connection with the sale of merchandise. Plaintiff
> simply contends that the Defendant's letter was 'an attempt to
> collect a debt in a deceptive matter.'  This allegation, even if
> true, does not give rise to a violation of the NJCFA.

Id. at *5.  In support of its rationale, the court cites to New Jersey federal and state cases

stating that the NJCFA must involve the sale of merchandise to a consumer, who is one

who uses economic goods.  Id.  The opinion makes no reference to Jefferson Loan or

Hoffman.

Lastly, Plaintiff directs the Court to the Appellate Division in Gonzalez, a case

arising out of a mortgage transaction between two owners of a home, Diaz and Gonzales,

and a commercial mortgage lender.  Diaz and Gonzalez executed a mortgage in favor of

---

[18]     The opinion does not use the term "debt buyer" to refer to Portfolio.
However, as indicated supra, Portfolio has been described by the United States Government
Accountability Office as a debt buyer, see GAO Report at 7-8, and the Nicholls opinion
quotes from a letter from Portfolio stating that Portfolio purchased the debt on April 21,
2009 and then filed its action to collect on the "defaulted debt" on May 1, 2009.  2010 WL
1257738 at *1.

the lender, but only Diaz signed the note securing the debt obligation.  After the mortgage was executed, the lender assigned the mortgage to another lender who, in turn, appointed Defendant Wilshire Credit Corporation ("Wilshire") as its servicing agent on the loan. Several years later, Diaz died intestate and Gonzalez defaulted on the loan.  Id. at 585.

Wilshire began foreclosure proceedings against Gonzalez and, thereafter, the parties' entered into an agreement to cure the default.  Id. at 586.  The agreement was termed a "stipulated payment agreement."  Gonzalez did not fully comply with that agreement hence the parties' entered into a second stipulation of payment agreement.  Upon obtaining counsel, Gonzalez filed suit against Wilshire under the NJCFA for, *inter alia*, improperly calculating the arrears in the second stipulated agreement and for inappropriately force-placing insurance on the loan.  Id. at 588.

The trial court ruled in favor of Wilshire, holding that Gonzalez was not a consumer in its dealings with Wilshire and, therefore, that the NJCFA did not apply.  The Appellate Court rejected this reasoning, holding instead that the stipulation of payment agreement was, in effect, a settlement agreement designed to cure the default on the initial mortgage loan.  Id. at 593.  The court cited Jefferson Loan as holding that an assignee could be held liable under the NJCFA for its "post-repossession conduct," id., but did not otherwise discuss the legal effect of Wilshire's role as a servicer on behalf of the assignee who owned the loan.  Furthermore, because the assignee purchased the loan pre-default, Gonzalez also

39

does not address whether a debt buyer is liable under the Act.

As this review of the case law illustrates, no precedential New Jersey case law directly answers the questions presented here—whether the NJCFA applies to a debt buyer's collection activities in collecting its own debt.  The non-precedential Appellate Court decision in <u>Hoffman</u>, as well as the non-precedential District of New Jersey decision in <u>Nicholls</u>, both hold that the NJCFA does *not* apply.  But those decisions do not address <u>Jefferson Loan</u>'s subsequent performance argument, or suggest policy reasons why the NJCFA should not reach the conduct of debt buyers who, while they were not part of the initial consumer transaction, interface with the consumer in collecting on the loan.

The New Jersey Supreme Court's denial of certification in <u>Hoffman</u>, and the lack of any precedential New Jersey authority on this issue, leaves this Court with incomplete guidance on how the Supreme Court would rule on the facts presented here.[19]  Thus, I turn to the law of other states in search of additional persuasive authority.

Several states, including Illinois, Georgia, Alaska, Idaho, Ohio, Nebraska, New York, and South Carolina, have concluded that debt collection activities generally fall within the ambit of their consumer fraud statutes.  <u>See</u> Mary Dee Pridgen, CONSUMER PROTECTION

---

[19]     New Jersey is not the only state to deny certification on this issue.  The Second Circuit, in <u>Kuhne</u>, certified a similar question to the New York Court of Appeals. 79 F.3d at 199.  Specifically, the <u>Kuhne</u> Court queried whether New York's consumer fraud act encompassed a violation of New York's debt collection statute by a debt buyer.  While the state court initially granted certification of the issue, it subsequently withdrew that grant and denied certification.

AND THE LAW § 4:24 (Oct. 2010).  One of the arguments espoused in some decisions is that

debt collection activities must be covered because a consumer "is not truly able to walk

away from the transaction until the debt is paid."  Id.  In this connection, the Kansas

Supreme Court has reasoned: "We cannot imagine that the legislature intended that an

independent debt collection agency may lawfully engage in deception and unconscionable

acts and practices which are prohibited if engaged in by the original creditor or one of his

agents." State ex rel. Miller v. Midwest Svc. Bureau of Topeka, Inc., 299 Kan. 322 (1981).

The plain language of the Kansas consumer fraud statute, however, differs from that in the

NJCFA in that it explicitly includes an "assignor . . who, in the ordinary course of business,

solicits, engages in, or *enforces consumer transactions, whether or not he or she deals directly with*

*the consumer*." Id. at 323 (quoting K.S.A. 50-626) (emphasis added).  Moreover, the Kansas

rationale does not distinguish between debt buyers and other types of debt collectors.

Other courts in states that have enacted a state version of the FDCPA have held that

violation of their state collections statute also constitutes a violation of their state consumer

fraud act. See, e.g., Flores v. Rawlings Co., 117 Hawai'i 153 (2008); Pabon v. Recko, 122

F.Supp.2d 311 (D.Conn. 2000); Kaplan v. Assetcare, Inc., 88 F.Supp.2d 1355 (S.D. Fla. 2000).

I do not find these cases instructive because, as noted, New Jersey has not adopted its own

fair debt collections act.[20]  Moreover, these cases do not often state whether the defendant

---

[20]        There is one decision by the Civil Court of the City of New York which holds
that New York's deceptive business practices act applies to a debt buyer.  See Centurion

is a debt buyer or a third-party debt collector collecting on behalf of another.

At least one court has addressed debt buyers specifically, albeit in a split decision.

In re Western Acceptance Corp., Inc., 788 P.2d 214 (Id. 1990), involved a defendant in a consumer fraud action who was in the business of purchasing past due accounts receivable and dishonored checks.  The majority ruled that debt buyers were subject to Idaho's act, which prohibits acts or practices "in the conduct of any trade or commerce."  Id. at 216 (quoting I.C. § 48-603 (1977)).[21]  The Idaho act, further, defined "trade" and "commerce," as "the advertising, offering for sale, sale, or distribution of any goods or services, directly or indirectly affecting the people of this state." Id. (quoting I.C. § 48-602(2) (1977)).  In the majority's view, the "collection of a debt arising out of a sale of goods or services is subject to the provisions of the [a]ct, even when the collection of the debt is by a third party who has purchased the debt from the seller."  Id.  For the majority, "[i]t [wa]s the sale that brings the debt into existence that is the crucial event."  Id.

Another justice on the court concurred in the judgment, noting his dispute with the majority's characterization of the defendant's debt buying business.  According to this

---

Cap. Corp. v. Druce, 828 N.Y.S.2d 851 (N.Y. Civ. Ct. 2006).  Most of the court's opinion deals with a claim under New York's fair debt collection statute.  However, in one paragraph with no analysis, the court also declines to dismiss the deceptive business practices act claim against the debt buyer.

[21]    While the Idaho statute has since been amended, the portions quoted by the In re Western Court remain in effect.

concurrence, the defendant purchased defaulted debt and then used threatening tactics to force the debtor to sign an agreement whereby the initial debt was extinguished but a new, more onerous, debt was created. Id. at 217. So, for example, a debtor would receive a letter from the defendant stating that he owed $101 in bad checks. The defendant would threaten to have the debtor thrown in jail unless she signed a note for a total of $753 at 11.78% interest. Id. at 218. In the concurrence's view, the defendant was, himself, engaged in the provision of credit by selling these type of "debt rearrangements." Id. at 217.

Finally, a dissenting justice takes issue with both of these views, arguing instead that the defendant " did not advertise, did not offer for sale, and did not sell or distribute any goods or services, directly or indirectly affecting the people of [Idaho]." Id. at 219. Furthermore, the dissent reasons, each of the unfair methods and practices listed as examples in the Idaho act "deal in some manner with unfair and deceptive practices used by sellers to effect a sale." Id. Moreover, the dissent continues, "[t]he term 'consumer' is a relational term. The thirty-six petitioners in this case were all at one point consumers in relation to a particular merchant or seller, but they are not consumers with respect to their relation to [Defendant]." Id. The dissent concludes with a policy argument:

> If debt collection activities are brought within the Act's umbrella merely because they "arise out of" an underlying sale, can we thereby assume that any activities bearing some connection to a sale, no matter how remote or attenuated the connection may be, are within the Act's coverage? . . . Is a person or business exercising self-help rights of repossession

43

> under the UCC, an area permeated with deceptive tactics, within the Act's amorphous scope? In my opinion, these activities, like those of [Defendant] in the instant case, would not be covered by the Act because the plain words of the statute cannot be construed reasonably to cover such activities.

Id. at 219-20.

The dissent's view is echoed in the district court decision in Melvin v. Nationwide Debt Recovery, Inc., No. 00-CV-212, 2000 WL 33950122 (W.D.Okla. Aug. 24, 2000), which holds that the actions of an independent debt collector do not fall within Oklahoma's consumer fraud act because "[i]f the Court were to construe this statute as Plaintiffs request, the result would be that every action alleged to be immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers in the course of business could give rise to litigation under the [Oklahoma] Consumer Protection Act, an act designed to protect buyers from sellers." Id. at *3. It is not clear from that opinion, however, whether the defendant was a debt buyer or merely collected on behalf of the initial credit card lender.

In sum, there is at least one state law decision, from Idaho, that substantively addresses whether the debt collection practices of a debt buyer should be subject to a state consumer fraud statute in a state whether or not the state has its own fair debt collection practices act. The Idaho majority decision, however, is not very persuasive because of the splintered holding of the Court. Moreover, the facts in that case are distinguishable because, as noted by the concurrence, the defendant in that case effectively sold debt

rearrangements to the consumer-debtors.

Neither is the dissent in that case particularly instructive.  While it tracks some of Hoffman's reasoning by concluding that there was no sale transaction between the debt buyer and the consumer, its policy argument would not likely be adopted by the New Jersey Supreme Court.  The dissent asks "Is a person or business exercising self-help rights of repossession under the UCC, an area permeated with deceptive tactics, within the Act's amorphous scope?"  788 P.2d at 219-20.  New Jersey courts would likely answer "yes" to this question,  see  Coastal Group, Inc. v. Dryvit Systems, Inc., 274 N.J.Super. 171, 178-9 (App. Div. 1994) ("under N.J.S.A. 12A:1-103, the UCC does not 'preempt' either common law fraud or Consumer Fraud Act claims") (citing  Delgozzo v. Kenny, 266 N.J.Super. 169, 183  (App.Div.1993)), and  views such a result as consistent with the legislative intent underlying the Uniform Commercial Code.

With no case law directly on point, and little persuasive authority, I turn to the legislative history.  As initially enacted, the NJCFA did not include the "subsequent performance of such person as aforesaid" language relied upon in Jefferson Loan.  That language was added by amendment in 1967.  See L. 1967, § 301, s. 2.  In that same amendment, the definition of "merchandise" under the Act was amended to include only those objects or services "offered directly or indirectly to the public for sale."  Id. at s. 1(c).  Unfortunately, nothing in the legislative history specifically addresses the "subsequent

45

performance" language, or the change in the "merchandise" definition.  The Senate bill's sponsor statement notes, simply, that the purpose of the amendment was to "permit the Attorney General to combat the increasingly widespread practice of defrauding the consumer, . . . which [practices] have caused extensive damage to the public."  S. 199, Sponsor Statement.  Likewise, the Governor's message on signing was that the amendment constituted a "significant step[ ] toward increased protection for the New Jersey consumer ...."  Office of the Governor, Assembly Bill No. 830, 1967 (Jun. 8, 1967).  This legislative history sheds no light on whether the NJCFA applies to assignees, in general, or assignees who purchase defaulted debt, in particular.

This leads me back to the plain language of the NJCFA.  The Act proscribes unconscionable acts relating to both the initial sale and advertisement of merchandise by a seller, and the "subsequent performance of such person as aforesaid."  Performance is not defined in the statute.  Its plain meaning, however, is either:  "[t]he successful completion of a contractual duty, usually resulting in the performer's release from any past or future liability;" or, simply, "execution."  Black's Law Dictionary (2009).

The latter definition fits here; read in the context of the statute, the "subsequent performance" language suggests that the actions of a seller in executing its agreement with the consumer fall within the NJCFA's control.  Accord Blatterfein v. Larken Associates, 323 N.J.Super. 167, 183 (App. Div. 1999) (describing the NJCFA as covering actions of a

defendant who "permits his services to be held out as part of what is being sold, or provided by way of influencing purchasers to enter into contracts, *or to maintain contractual relationships*, he becomes subject to the Consumer Fraud Act just as every other person involved in inducing the sale or *preserving the transaction* may be.") (emphasis added). Indeed, this is the view expressed by the Third Circuit in <u>Weiss</u>, when it describes fraud in the subsequent performance as "a party trying to protect its profit margin [who] *stops complying with certain contract specifications* while at the same time falsely representing strict compliance." 482 F.3d at 266 n.8 (emphasis added). On its face, however, the language of the statute is still ambiguous because it does not suggest that the actions of assignees, particularly those who have purchased defaulted debt and will not execute the original agreement, are included, nor does it foreclose that possibility.

Taking into consideration the ambiguity of the statutory language, the lack of New Jersey Supreme Court case law, and that the Appellate Division's decision in <u>Jefferson Loan</u> is factually distinguishable, I find no basis for predicting that the New Jersey Supreme Court would hold that the legislature intended for the NJCFA to reach the debt collection activities of a debt buyer of defaulted credit card debt.  A debt buyer, while subject to regulation under the FDCPA and, perhaps, New Jersey's Collection Act or criminal statutes, is not a "seller" whose "subsequent performance" falls within the ambit of the NJCFA.

My conclusion is buttressed by the New Jersey legislature's repeated failure to enact a bill establishing New Jersey's version of the FDCPA, which bill expressly indicates that a violation of it would constitute a NJCFA violation.  Both the 2008 and 2010 versions of the bill would encompass the debt collection activities of debt buyers.  That the legislature has chosen *not* to adopt this sort of legislation further suggests that NJCFA should be read as excluding the debt collection activities of debt buyers.  Cf. Lee, 199 N.J. at 261 n.3 (reasoning that legislature's repeated failure to enact legislation augmenting the definition of "merchandise" to include securities supports a reading of the NJCFA that excludes securities).

My conclusion is further supported by the policy distinction, under the FDCPA, between debt buyers and third-party debt collectors acting on behalf of an owner.  As the Third Circuit noted in Check Investors, debt buyers operate under different motivations than commercial lenders.  Unlike commercial lenders who may desire to remain in a contractual relationship with the consumer before, during, and after collection activity, debt buyers have no relationship with the consumer apart from collection of the defaulted debt.  Hence, the FDCPA, and those states that have adopted similar statutes, have created an exhaustive statutory scheme directed specifically at debt buyers.

Moreover, assignees that purchase the loan pre-default from a commercial lender and service that loan stand on a different footing than debt buyers who will never

"perform," execute, or seek to maintain the relationship contemplated by the original agreement. While it would be inapt to blindly import the policy underlying the FDCPA, a federal statute, into state law, that there is New Jersey state and federal case law applying the NJCFA to assignees who purchase pre-default, Jefferson Loan, supra; Gonzalez, supra; In re NorVergence, supra, yet declining to apply the NJCFA to debt buyers, Hoffman, supra; Nicholls, supra, suggests that the distinction noted in the FDCPA context is also relevant under the NJCFA. Reading the aforesaid cases together in this fashion also "eliminate[s] inconsistency between the federal and state courts in the application of [New Jersey] law." Jaworowski, 490 F.3d at 333.

Reference to In re NorVergence, supra, a case cited by Plaintiff, further illustrates the distinction I make. In that case, a defendant-finance company took assignment of an equipment rental agreement (ERA) from a re-seller of telecommunications equipment. In conjunction with the equipment rental agreements, the re-seller sold five-year telecommunication service agreements to the consumer-purchasers without having entered into any long term agreement with a carrier that would permit the re-seller to provide the five-years of service. Id. at 671. Upon execution of the ERAs, the re-seller immediately assigned them to the defendant but the re-seller remained responsible, under the service agreements, to provide the telecommunications services. After the ERAs were assigned, the re-seller encountered financial difficulty and ceased providing telecommunications

49

services.  Id. at 672.

The bankruptcy court, relying on Jefferson Loan, held that the defendant-finance company could be held liable under the NJCFA for its own unconscionable conduct in seeking payment from the consumers, on the ERAs, while knowing that the re-seller was no longer providing those consumers any telecommunications services.  Id. at 705.  These sort of allegations, the court reasoned, pointed to the assignees' "own subsequent performance of the contract."  Id.  In my view, this result is consistent with the notion that an assignee *who performed or executed the contract* should be held liable for any of its own unconscionable conduct.  The assignee-finance company received assignment of the loan at its inception and serviced the ERA.  While it was not obligated to provide the telecommunications services directly, the consumer relationship between it, the re-seller, and the consumer was ongoing and involved the continued performance of the agreements between all three parties.  A debt buyer, in contrast, is not obligated to perform or execute the underlying agreement in any way and, therefore, cannot "subsequently perform" under the Act.

I recognize that the NJCFA has been interpreted liberally by the New Jersey Supreme Court.  Indeed, the Court has described the "scope of the CFA's proscriptions [a]s both wide and deep."  Real v. Radir Wheels, Inc., 198 N.J. 511, 521 (2009).  But, in the same breath, the Court has noted that "the reach of the CFA is not without boundaries."  Id. at

50

522.  Furthermore, the Court has limited the scope of the NJCFA when there is an indication that the legislature did not intend for certain claims to fall within the Act's purview.  Lee, 199 N.J. at 263 (concluding that the NJCFA "was not meant to reach the sale of securities ....").

Lastly, Plaintiff appears to argue that Hudson Law's alleged violation of New Jerseys' Professional Services Corporation Act and the FDCPA may constitute independent violations of the NJCFA.  Because I conclude that the NJCFA does not encompass claims brought against debt buyers, I do not reach this argument.[22]  In any event, Plaintiff has not provided the Court with any case law supporting her proposition that an alleged violation of the PSCA or FDCPA acts also constitutes a violation of the NJCFA.  It is not the Court's obligation to flesh out Plaintiff's undeveloped argument.  Accordingly, Plaintiff's NJCFA claim is dismissed.

---

[22]     While the Court need not reach whether the learned professional exemption applies to Plaintiff's NJCFA claim, were the Court to find that a NJCFA claim had been properly pled, Defendant Lauri Hudson would be entitled to that exemption to the extent that the Court concludes she acted as Hudson Law's lawyer.  Hudson Law, however, would not be entitled to the exemption because its alleged debt buying activities are outside the practice of the law profession.  See Macedo v. Dello Russo, 178 N.J. 340, 345–46 (2004); cf. Blatterfein v. Larken Associates, 323 N.J.Super. 167, 183 (App. Div. 1999) ("[W]here [an] architect has involved himself either as a principal or a retained professional in a real estate marketing venture wherein he permits his services to be held out as part of what is being sold, or provided by way of influencing purchasers to enter into contracts, or to maintain contractual relationships, he becomes subject to the Consumer Fraud Act just as every other person involved in inducing the sale or preserving the transaction may be.).

### D.   TCCWNA

The Truth-in-Consumer Contract, Warranty and Notice Act, N.J.S.A. 56:12-15 ("TCCWNA"), prohibits consumer contracts, warranties, notices, or signs with provisions that "violate[ ] any clearly established legal right of a consumer" or "[a] clearly established legal . . . responsibility of a . . . creditor ...."  Under this act, one who violates the TCCWNA is liable for either a $100 civil penalty or actual damages.  N.J.S.A. 56:12-17.

As a threshold matter, Defendants apparently concede for the sake of this motion that Plaintiff's debt was the result of a consumer contract.  Def. Reply at 6.  The more pertinent question, though, is whether the complaint itself is a consumer contract or "notice" under the TCCWNA, which term is not defined by the statute.  Courts have held that a payoff statement, for example, constitutes a notice under the Act.  See Rickenbach v. Wells Fargo Bank, N.A., 635 F.Supp.2d 389, 400 (D.N.J. 2009) (concluding that payoff statement sent by mortgagee's attorney in prosecution of foreclosure action was a "notice" under the TCCWNA).

I need not decide here whether the Hudson Complaint is a "notice" because, even assuming as much, courts focus upon the underlying debt instrument—not the legal complaint seeking to collect the debt— in assessing the viability of claims brought under the TCCWNA by a successor-in-interest.  See e.g., Rivera v. Washington Mut. Bank, 637 F.Supp.2d 256, 268 n.22 (D.N.J. 2009) (focusing on underlying mortgage and note in

foreclosure action brought by successor-in-interest to mortgage and note); Skypala v. Mortgage Electronic Registration Systems, Inc., 655 F.Supp.2d 451, 459 n.20 (D.N.J. 2009) (same).  Hence Defendants correctly argue that Plaintiff's claim must fail because she does not allege that a provision in the underlying credit agreement with First Bank of Delaware contained a provision that violates her clearly established rights or the creditor's clearly established responsibilities.  Rather, she challenges the content of the complaint filed to collect on the debt.  For this reason, Plaintiff's TCCWNA claim must be dismissed.

### E.    Individual Liability

Defendant Hudson moves to dismiss the NJCFA claim asserted against her individually because the allegations against her speak to actions completed in her professional capacity as attorney for Hudson Law, the owner of Plaintiff's debt.  Because the NJCFA and TCCWNA claims are dismissed for the reasons set forth above, I need not resolve the question of whether these statutes reach her individual conduct. With respect to the FDCPA claim, it is clear that attorneys may be held liable for misleading statements made on behalf of their clients.  See Jerman, 130 S.Ct. at 1618; Check Investors, 502 F.3d at 172.[23]  Thus, the FDCPA claim against Hudson remains.

### IV.   CONCLUSION

---

[23]    In making this statement, the Court does not rule that Hudson acted in her professional capacity as an attorney in representing her own firm in connection with the state court action to collect Plaintiff's debt.

For the foregoing reasons, the Court denies Defendants' motion with respect to the FDCPA claim, but grants Defendants' motion with respect to the NJCFA and TCCWNA claims.  Defendants' request to dismiss Defendant Lauri A. Hudson is also denied.


Dated: March 21, 2011                                    /s/ Freda Wolfson
                                                         Honorable Freda L. Wolfson
                                                         United States District Judge